**FOURTH DIVISION**
**BARNES, P. J.,**
**RAY and MCMILLIAN, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules/**

**July 16, 2015**

# In the Court of Appeals of Georgia

A15A0431.  COMMUNITY  &  SOUTHERN  BANK  v.  CLEAR CREEK PROPERTIES et al.

MCMILLIAN, Judge.

Community & Southern Bank (the "Bank") appeals after a jury returned a verdict in favor of Garry Haygood ("Haygood") and Haygood Family Investments, LLC ("HFI") in the Bank's contract action against them. For the reasons set forth below, we reverse.

"On appeal following a jury verdict and judgment, this Court must construe the evidence with every inference and presumption in favor of upholding the verdict, and after judgment, the evidence must be construed to uphold the verdict even where the evidence is in conflict." (Citation and punctuation omitted.) *One Bluff Drive, LLC v. K. A. P., Inc.*, 330 Ga. App. 45, 45 (766 SE2d 508) (2014).

So viewed the evidence shows that HFI and Haygood, along with Clear Creek Properties, LLC ("Clear Creek"), Legacy Mountain Properties, LLC ("Legacy"), A. S. Dover Development, Inc. ("A. S. Dover"), Dover-Pfister, LLC n/k/a Dover Development, LLC ("Dover Development"), and Alan S. Dover ("Dover"), executed nine promissory notes and numerous commercial guaranties in favor of Gilmer County Bank ("GCB")[1] in connection with real estate development projects, including a project known as "Falling Waters." Haygood and Dover both held a percentage ownership interest in Legacy and Clear Creek, and both men participated in borrowing money to finance Falling Waters.[2] Ultimately, Clear Creek, HFI, Legacy, A. S. Dover, Dover Development, Haygood, and Dover all defaulted on their repayment obligations under their respective promissory notes and guaranties. The Georgia Department of Banking and Finance closed GCB in March 2010,[3] and the

_____

[1] GCB was a division of Appalachian Community Bank ("ACB").

[2] Dover testified that Dover Development owned Legacy and Clear Creek, and in connection with Haygood's investment in Falling Waters, he received a 25 percent stake in Legacy and Clear Creek.

[3] The evidence indicated that fraudulent loans made by GCB president Tracy Newton and chief loan officer Adam Teague ultimately led to the bank's failure.

loans were assigned and transferred to the Bank pursuant to a Purchase and Assumption Agreement with the Federal Deposit Insurance Corporation. ("FDIC").

At the pertinent time, Dover was a real estate developer and a director at GCB, serving on the loan committee. Dover originally purchased the land for the Falling Waters project for around $36 million in August 2006. He borrowed the money for this purchase from GCB and did not put up any of his own money to fund the transaction. Dover was the largest borrower at GCB, and his loan requests were routinely approved. Additionally, he was sometimes present at loan committee meetings in which his loans were approved, although he did not vote on his own loans. Dover did not provide his financial information to GCB in connection with his loan applications, and GCB did not maintain any financial information on him.

Nevertheless, GCB routinely renewed Dover's loans over a period of 13 years. Over time, as Dover's loans approached or exceeded legal lending limits, GCB sold portions of the loans to other banks pursuant to participation agreements. As one former GCB loan officer explained, federal banking laws provide that a single borrower can only borrow a certain percentage of a bank's capital. If the borrower exceeds that limit, the bank must divest itself of the loans. Once GCB divested itself of some of Dover's loans, it could then lend him additional funds.

Haygood also was involved in real estate development and construction during the relevant period.[4] At issue in this appeal is a $3 million loan GCB extended to Haygood individually on September 21, 2007 in connection with the Falling Waters project (the "Haygood Loan"). (See Addendum "A" for a list of the other promissory notes and guaranties at issue at trial, hereinafter referred to collectively as the "Other Notes.") Haygood testified that he was solicited by Dover to invest money in Falling Waters in or around September 2007. Dover first suggested that Haygood buy a 49 percent interest in the project, but Haygood had "no interest in that at all." Dover later suggested that Haygood buy 25 percent of the project for $5.2 million. Haygood was hesitant; he did not have much cash at the time because he had recently paid off all of his debt. Nevertheless, he told Dover that he could raise about $2 million to invest. Dover knew that Haygood owned real property on Rackley Road in Hall County (the "Rackley Road Property") debt-free, and he suggested that Haygood use the property as collateral to apply for a loan at GCB. Haygood ultimately agreed to the $5.2 million investment, if he could borrow $3 million from GCB on the Rackley Road Property.

---

[4] Haygood served on the board of directors of a Cherokee County bank and was a shareholder in GCB, having invested $75,000.

In connection with the Haygood Loan, GCB ordered an appraisal on the Rackley Road Property at Haygood's expense. That appraisal, dated September 13, 2007, set the value for the Rackley Road Property at $2,640,000, which was not high enough to support the loan as GCB required an 85 percent loan-to-value ratio. GCB subsequently ordered another appraisal, from the same appraiser, which reflected a value for the Rackley Road Property of $3,510,000 as of September 20, 2007. Because Dover needed the funds quickly, the Haygood Loan closed the next day, and Haygood was not provided a copy of either appraisal, although GCB's policy was to give the borrower an appraisal three days before closing. Also in connection with the Haygood Loan, Haygood signed a Security Deed and Agreement dated September 21, 2007, which contained a dragnet clause providing that any subsequent debt incurred by Haygood could be consolidated under its terms, allowing foreclosure on the Rackley Road Property in connection with such debt. Haygood gave Dover the proceeds of the Haygood Loan and $2.2 million in cash to fund his $5.2 million investment in Falling Water.[5]

---

[5] The Haygood Loan apparently was renewed on two occasions, and the Bank ultimately brought suit on a promissory note dated September 30, 2009 in favor of GCB in the principal amount of $3,002,363, plus interest and a Commercial Loan Agreement dated October 1, 2009, each signed by Haygood, individually. The September 30, 2009 promissory note states that it is a re-financing of an earlier note

5

In December 2008, Adam Teague, chief loan officer at GCB, informed Haygood of a problem with the loans relating to Falling Waters, and he scheduled a meeting to discuss the matter with Haygood, Dover, GCB president Tracy Newton and Joseph C. Hensley, a member of the GCB board of directors, who served on GCB's Audit Committee. Hensley, a CPA, also worked for Dover. At the meeting, GCB informed Haygood that Unity Bank had entered into a participation agreement with regard to a portion of a $7.5 million loan issued to Legacy in connection with the purchase of the Falling Waters property. (See Note 5 in Addendum "A") Although GCB had renewed the loan several months earlier, Unity was no longer willing to participate in it, and GCB was unable to carry the full loan on its books because Dover had reached his legal lending limits. Accordingly, GCB told Haygood that unless the loan was paid in full, GCB would have to foreclose on the Falling Waters property. Haygood was asked to assume $3 million of the loan. Prior to this meeting, Haygood was unaware of Unity Bank or any problems with Dover's loans.

At first, Haygood refused to assume any portion of the loan, but later, on behalf of HFI, he signed a December 23, 2008 promissory note in the principal amount of $4,623,000, plus interest ("First HFI Note"). Haygood stated that he signed the loan dated September 21, 2008 in the amount of $3 million.

6

documents because "[i]t was just a function, basically, to . . . get the bank out of trouble and to keep the project from going into foreclosure and [to keep the loan] current." He stated that the loan also gave the Falling Waters project some operating money. Haygood said that if he had not signed the loan, the Falling Water Project would have been "dead," and he would have lost the money he invested.

On April 21, 2009, the FDIC issued an "Order to Cease and Desist" (the "Order") against GCB directing it to cease and desist from a list of "unsafe or unsound banking practices and violations of law and/or regulations." Haygood did not receive a copy of the Order and was unaware of it when, on August 27, 2009, he signed another promissory note in the principal amount of $4,022,286.50, plus interest, on behalf of HFI (the "Second HFI Note").[6] The proceeds of that loan were used to bring all the other loans current. Haygood stated that he would never have signed Second HFI Note if he had known of the Order. Haygood did not receive any of the proceeds of the two HFI loans.

---

[6] Haygood, Dover, and A. S. Dover signed commercial guaranties with GCB guaranteeing repayment of the First and Second HFI Notes (collectively, the "HFI Guaranties").

At trial, Haygood asserted the defense of illegality to the Haygood Loan based on this evidence, and the Bank moved for a directed verdict on that defense, which the trial court denied. The jury subsequently returned a verdict in favor of Haygood on the Haygood Loan and in favor of Haygood and HFI on the First and Second HFI Notes and the Other Notes.[7]

1. The Bank first asserts that the trial court erred in denying its motion for directed verdict on Haygood's illegality defense. We agree.

Under Georgia law, "[a] contract to do an immoral or illegal thing is void. If the contract is severable, however, the part of the contract which is legal will not be invalidated by the part of the contract which is illegal." OCGA § 13-8-1 (a). And "[t]he character of the contract in such case is determined by the intention of the parties." OCGA § 13-1-8 (b). But OCGA § 13-8-1 "has been held inapplicable where the *object* of the contract is not illegal or against public policy, but where the illegality or immorality is only collateral or remotely connected to the contract." (Citation and punctuation omitted; emphasis in original.) *Kelley v. Cooper*, 325 Ga. App. 145, 147 (1) (751 SE2d 889) (2013).

---

[7] The jury, however, found in favor of the Bank and against Crystal Creek, Legacy, A. S. Dover, Dover Development, and Dover on the Other Notes, but that determination is not a part of this appeal.

In connection with that defense, Haygood's counsel argued to the jury that the Bank's actions with regard to the Haygood Loan constituted the crime of residential mortgage fraud in violation of OCGA § 16-8-102 (2).[8] In particular, counsel argued that the appraisal used to acquire the loan was fraudulent, which he argued violated the statute. He also argued that the Bank entered into the Haygood Loan to get around the cap on Dover's lending limits and as part of a "scheme" to avoid having the regulators investigate the Bank's practices. Haygood's counsel further argued that the illegality of the Haygood Loan "infected every one of the later loans." We find that any alleged illegality is only collateral to the Haygood Loan, and therefore does not render the Haygood Loan, the HFI Notes, or the Other Notes void.

---

[8] OCGA § 16-8-102 (2) provides:

A person commits the offense of residential mortgage fraud when, with the intent to defraud, such person . . . [k]nowingly uses or facilitates the use of any deliberate misstatement, misrepresentation, or omission, knowing the same to contain a misstatement, misrepresentation, or omission, during the mortgage lending process with the intention that it be relied on by a mortgage lender, borrower, or any other party to the mortgage lending process.

9

In reaching this conclusion, we find the case of *Scott v. Citizens Bank of Americus*, 188 Ga. App. 618 (373 SE2d 633) (1988), to be instructive.[9] In that case, the bank was being investigated by state banking examiners for entering into a number of "'criticized loans,'" as the bank continued to operate pursuant to a "'memorandum of understanding.'" Id. at 618. After the state bank examiners completed their investigation, bank officials found a defaulted real estate loan that the examiners had failed to discover. The bank's president and its loan officer decided not to disclose this loan to the examiners, but instead they "devised a plan to remove this defaulted loan from the [b]ank's books before it was discovered." Id. Under the plan, the appellant, who was "a close personal friend of the [b]ank's president," signed a promissory note in favor of the bank, and the funds from that note were given to a third party, who used them to purchase the property underlying the defaulted loan. Id. "The president and the loan officer of the [b]ank acknowledged that their plan was to create a 'paper trail' and to use appellant 'as sort of a strawman, third party, just as somebody to sign the notes and create the documents to satisfy

---

[9] There, because the appellant did not assert the affirmative defense of illegality, this Court's analysis on the issue could be considered dicta. Nevertheless, we find the reasoning persuasive and adopt it.

10

banking requirements.'" Id. The appellant denied any knowledge of this plan or his role in it, and he subsequently defaulted on the note. Id. at 618-619.

When the bank sued to collect on the note, the appellant, on appeal, apparently raised the defense of illegality based on the bank officials' plan to remove the loan from their books. However, this Court found that the appellant's defense of illegality was not viable as to the note at issue. As the Court explained,

> [t]he underlying transaction at issue was merely an advancement of funds which appellant agreed to repay as evidenced by his execution of the note. This transaction was no more illegal than any other loan transaction evidenced by a promissory note. It may have been intended that the transaction serve as a means for removing a defaulted real estate loan from the [b]ank's books, but this would not render the transaction illegal. Financial institutions are certainly authorized to arrange for the removal of such loans from its books under the most favorable terms that can be negotiated. There may have been an element of unethical behavior underlying this particular transaction, because it was *timed* so as to remove the defaulted loan from the Bank's books prior to its discovery by the bank examiners. However, this unethical behavior would not render the note unenforceable against appellant. *Scott*, 188 Ga. App. at 620 (2).

Here, Haygood's illegality defense centered on the illegal appraisals in connection with the Haygood Loan in September 2007, which he argued tainted all

11

subsequent loans. We disagree. It is apparent from the record that GCB advanced the funds to Haygood to facilitate his purchase of a 25 percent interest in Legacy and/or Clear Creek and thereby invest in Falling Waters. In signing the note, Haygood agreed to repay the funds borrowed. And, indeed, shortly after signing the Haygood Loan, on October 11, 2007, Haygood and Dover signed a "Transfer and Assignment of Membership Interest," which transferred a 25 percent interest in Legacy to HFI in exchange for consideration of $5,128,205; an amendment to the Legacy's operating agreement, reflecting that HFI owned 25 percent of the company; and an "Indemnity and Guaranty Agreement,"under which HFI agreed to indemnify A. S. Dover for certain listed loans signed in connection with Falling Waters. Additionally, the evidence at trial indicated that Haygood sought legal advice before entering into this investment. These events occurred approximately one year before Unity Bank decided that it would no longer participate in Dover's loans and approximately one year and one-half before the Order.

Accordingly, "[t]his transaction was no more illegal than any other loan transaction evidenced by a promissory note." *Scott*, 188 Ga. App. at 620 (2). And no evidence exists that the contract was based on illegal or immoral consideration. Dover was legally entitled to seek other investors to support the Falling Waters project and

12

to reduce his own debt. Haygood had the legal right to invest in the Falling Waters project, and the Bank was legally entitled to loan him money for that purpose. No evidence exists that Haygood was approaching his lending limits with the Bank; to the contrary, he indicated that he had just paid down his debt.

Although the Bank may have asked for a second, higher appraisal to support the Haygood Loan, which Haygood contends was fraudulent and even criminal,[10] and may have engaged in other subsequent illegal activity, any such illegal activity was, at most, merely collateral to the Haygood Loan; it was not the object of the loan. As our Supreme Court explained in *R.R.R., Ltd. Partnership v. Recreational Svcs., Inc.*, 264 Ga. 494 (448 SE2d 211) (1994), such incidental illegality is insufficient to render an otherwise valid promissory note unenforceable. There, the Court rejected the defense of illegality in connection with a promissory note, where the borrower alleged that the lender threatened violence if the loan was not repaid promptly, resulting in an extortionate extension of credit in violation of 18 USC § 891 (c). The Supreme Court explained that

---

[10] Although Haygood presented expert testimony at trial attacking the methodology and validity of these appraisals , we note that in a financial statement dated April 2008, Haygood himself represented the value of the Rackley Road Property to be $3,600,000.

the federal statute upon which appellee relies merely serves to criminalize the lender's alleged act of making an "extortionate extension of credit." 18 USC § 892 (a). Nothing whatsoever in that federal statute purports to render the underlying loan agreement *itself* illegal and civilly unenforceable against the borrower. In this state, a contract *to do* an illegal thing is void [under] OCGA § 13-8-1. However, there is nothing inherently "illegal" in an agreement whereby one party merely agrees to lend money and the other party merely agrees to repay it.

(Citations and punctuation omitted; emphasis in original.) Id. Thus, the Supreme Court found that the breach of the statute was not a viable defense to the borrower's obligation to repay the loan in full, noting that

[t]he rule that an agreement in violation of law is invalid does not always apply where the existence of the thing in question is due to a violation of law only in the sense that incidentally some law was violated in its production, where it might have been created without such violation. Here, the contract was for a legal purpose, and did not *require* a violation of any statute in order for [the borrower] to perform under the contract. There may or may not have been a violation of the federal criminal statute, but such violation was not required by the contract and was incidental to contractual performance.

(Citation and punctuation omitted; emphasis in original.) Id. at 496-497 (2) And, here, even if the Bank violated the law in connection with obtaining the appraisals to

14

support the Haygood Loan or subsequently violated Georgia banking laws, any such violation was not required by the Haygood Loan and was merely incidental to its purpose.

Accordingly, we find that the trial court erred in denying the Bank's motion for directed verdict as to Haygood's defense of illegality. See *R.R.R. Ltd. Partnership*, 264 Ga. at 495-496 (2); *Crooke v. Gilden*, 262 Ga. 122, 123 (2) (414 SE2d 645) (1992); *Smith v. Saulsbury*, 286 Ga. App. 322, 323-324 (1) (b) (649 SE2d 344) (2007); *Douglas v. Bigley*, 278 Ga. App. 117, 124 (1) (d) (628 SE2d 199) (2006); *Boot v. Beelen*, 224 Ga. App. 384, 386 (1) (480 SE2d 267) (1997) (where promise to be enforced is one to pay a debt, parties' meretricious relationship was incidental to the contract). Compare *Minor v. McDaniel*, 210 Ga. App. 146 (435 SE2d 508) (1993) (promissory note between broker and client to reimburse broker for monies borrowed to pay part of closing costs was illegal where broker induced client to falsely certify that the residence was free and clear of all liens, that she would not have any other outstanding unpaid obligations in connection with the mortgage transaction, and that she had paid all the closing costs and client knew such certifications were false); *Southern Flour & Grain Co. v. Smith*, 31 Ga. App. 52, 53 (120 SE 36) (1923) (contract illegal where terms of contract involved directly involved sale of

15

"concentrated commercial feeding-stuffs" in non-standard weight bags, a direct infraction of a civil statute).

Therefore, we also agree with the Bank that the trial court erred in denying its directed verdict on the First and Second HFI Notes and the Other Notes, in submitting the issue of whether the Bank had violated the OCGA § 16-8-102 to the jury, and in charging the jury on the statute. Moreover, because Haygood offered his expert's testimony in connection with his affirmative defense of illegality, we need not reach the issue of whether the trial court properly applied the standard under *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (113 SCt 2786, 125 LE2d 469) (1993). Accordingly, we reverse the judgment in favor of Haygood and HFI and remand for entry of judgment in favor of the Bank on the Haygood Note, the HFI Notes and the Other Notes in accordance with this opinion.

*Judgment reversed. Barnes, P. J., and Ray, J., concur.*

## Addendum "A" – Other Notes

*Clear Creek Notes*

The record indicates that Clear Creek signed the following three promissory notes in favor of GSB:

– a December 14, 2007 promissory note in the principal amount of $3,000,000, plus interest ("Note 1");

– a September 26, 2008 promissory note in the principal amount of $800,000, plus interest ("Note 2"); and

– an August 27, 2009 promissory note in the principal amount of $3,087,000, plus interest ("Note 3"). Legacy, A. S. Dover, Dover Development, HFI, Haygood, and Dover entered into commercial guaranties with GCB guaranteeing repayment of Notes 1, 2, and 3 (collectively, the "Clear Creek Guaranties").

*Legacy Notes*

Legacy also entered into two promissory notes in favor of GCB, as follows:

– an August 30, 2008 promissory note in the principal amount of $1,000,000, plus interest ("Note 4"); and

– an August 30, 2008 promissory note in the principal amount of $7,500,000, plus interest ("Note 5").

A. S. Dover, Dover Development, and Dover executed commercial guaranties with GCB guaranteeing repayment of these notes (collectively the "Legacy Guaranties").

*Dover Development*

On March 26, 2009, Dover Development entered into a promissory note with GCB in the principal amount of $111,380.86, plus interest ("Note 6"). Dover entered into a guaranty of this note with GCB, guaranteeing repayment of the note ("Dover Guaranty").